# Exhibit 4

Transcript of Cross Examination of Fabian Munoz

1          Ms. Crager, do you wish to cross-examine?

2               MS. CRAGER:  Yes.  Thank you, Your Honor.

3               THE COURT:  You may proceed.

4                         CROSS-EXAMINATION

5    BY MS. CRAGER:

6    Q.  Good morning, Mr. Munoz.

7    A.  Good morning, miss.

8    Q.  Mr. Munoz, today is not the first time you've talked about

9    the course you took with Rob Pooley?

10   A.  Before I traveled to the United States?

11   Q.  I'm asking is today the first time you've ever spoken about

12   the course with Rob Pooley?

13   A.  Can you explain that question a little bit better?

14   Q.  Well, you spoke to a federal agent in 2021?

15   A.  That's right.

16   Q.  And at that time, the agent asked you a lot of questions

17   about Rob Pooley?

18   A.  That's right.

19   Q.  And the agent asked you a lot of questions about the course

20   you took with him?

21   A.  I remember that well, yes.

22   Q.  And about the paperwork?

23   A.  That's right.

24   Q.  I want to talk about some of the things that have changed

25   in your version of events.

1          Today, you testified that you printed your own paperwork;

2    is that right?

3    A.  That's right.

4    Q.  You testified that Rob never gave you any paperwork?

5    A.  That's right.

6    Q.  You testified that you expected Rob Pooley to sign your

7    documents?

8    A.  Can you please repeat the question?

9    Q.  Did you testify earlier that you expected Rob Pooley to

10   sign your documents?

11   A.  That's right.

12   Q.  And you testified earlier that you confronted Rob Pooley

13   and demanded that he sign your documents?

14   A.  That's right.

15   Q.  All right.  That's not what you said in 2021.

16        In 2021, you said during the course, Rob Pooley handed you

17   paperwork.

18   A.  Back then, I said that Rob Pooley was the person that would

19   be handing the documents.  But that's not the way it happened.

20   Q.  I'm asking you about what you said in 2021.

21        And what you said at that time was that Rob Pooley was the

22   one to hand you the documents.

23   A.  He handed me some documents having to do with the coaching

24   courses.

25   Q.  I see.

1          Your testimony today is that in 2021, you're only talking

2    about the coach course?

3    A.  I was speaking about the coaching course and the instructor

4    course.

5    Q.  Okay.  And in 2021, you said Pooley gave you documents for

6    USPA and UPT.

7    A.  He handed documents regarding the coach course.

8    Q.  You also said, in 2021, the courses you were taking with

9    Rob Pooley for paperwork were coach, a D license, a canopy

10   proficiency card, a new membership, and a tandem instructor

11   course.

12   A.  Those documents, I printed.

13   Q.  I understand that's your testimony today.  I'm asking what

14   you said in 2021.

15   A.  So much time has passed since 2021 that I would have to

16   start trying to remember.

17   Q.  I see.  So it's hard to remember exactly what you said back

18   then?

19   A.  Um-hum.

20   Q.  Okay.  So you don't know whether you said that or not

21   because it was so long ago?

22   A.  I do remember.

23   Q.  You do remember.  Okay.

24          So do you also remember in 2021, you told a federal agent

25   that the documents Rob Pooley gave you were already signed?

1   A.  The documents that he gave to the other students were

2   already signed.

3   Q.  My question is in 2021, you said Rob Pooley gave you

4   documents that were already signed?

5   A.  He didn't give any to me.  I saw other documents that were

6   already signed.

7   Q.  Is it your testimony that you did not say these things in

8   2021?

9   A.  I -- I believe having said it, yes.

10  Q.  Okay.  And you also said that the paperwork was signed by

11  another guy, not Mr. Pooley.

12  A.  The documents had somebody else's signature, not

13  Mr. Pooley's.

14  Q.  Correct.  The documents that he gave you, as you stated in

15  2021.

16      And you also said that the other guy whose signature was on

17  that paperwork was not there.

18  A.  I never saw any other person.  I always dealt with

19  Mr. Pooley.

20  Q.  Yes.  And my question is in 2021, you said Rob Pooley gave

21  you documents signed by another person and that you knew that

22  person wasn't in Lodi?

23  A.  I never knew if that person was in Lodi.  The only thing I

24  knew was that Rob Pooley taught that class.  And I always dealt

25  with him regarding the course.  I never dealt with anybody

1  else.  At all times, I dealt with him.  And he always assured

2  me that everything was all right.

3  Q.  I'll stop you there.  I understand -- I understand your

4  testimony today.

5      What I'm asking you is what you told a federal agent in the

6  year 2021, the first time you were contacted by law

7  enforcement.

8      And my question is you told law enforcement your paperwork

9  from Rob Pooley was signed by another person, and you knew that

10 that person was not in Lodi?

11 A.  I did not know that that person was not in Lodi.

12 Q.  Are you saying you never said that to a federal agent?

13 A.  When I had that -- my conversation with the -- with the

14 agent, I -- starting -- I started remembering about my case,

15 and that's what I told them about.

16 Q.  So you did say that in 2021 to the federal agent?

17 A.  In 2021, I started generally explaining my story to a

18 federal agent.

19 Q.  My question is did you say that to an agent in 2021?

20 A.  I told them that the person that had given the course was

21 not the proper person and that it had not been signed by the

22 correct person.

23 Q.  And you're saying that in 2021, you told them that, that

24 your paperwork was signed by someone who knew -- you knew was

25 not in Lodi?

1        My question is a yes or no question.  I understand your

2   explanation.

3   A.  I don't remember.

4   Q.  You don't remember if you said that?

5   A.  I don't remember having said that.

6   Q.  Would it help you remember if you saw some notes written by

7   the agent from that interview?

8              MR. SHARMA:  Objection, Your Honor.

9              THE COURT:  What's the objection?

10             MR. SHARMA:  It's not his statement.  He can't be

11  refreshed based on someone else's statement.

12             THE COURT:  It's done all the time, but you're quite

13  right.  But sometimes looking at somebody else's statement does

14  refresh their recollection.  Let's let him look at it.

15       And I'm going to explain to him what we're asking him to

16  do.

17       Mr. Munoz, you're going to be shown the statement that was

18  made by an FBI agent after speaking with you.  The only reason

19  it's being shown to you is to see if reading that statement

20  helps you remember what you said to the FBI agent.  If it

21  doesn't help you remember what you said to the FBI agent, just

22  tell us.  But if it does help you remember, tell us that.

23  We're just interested in your recollection, not what the agent

24  said.

25       Understood?

```
 1                THE WITNESS:  Yes, I understand.

 2                THE COURT:  All right.  Go ahead.

 3   Q.  BY MS. CRAGER:  I'm going to direct you to Exhibit 2140.

 4   And if I may approach, I'll just pull it out for you.

 5                THE COURT:  Don't read it out loud.  Just read it to

 6   yourself.

 7                THE INTERPRETER:  Counsel, the document is in

 8   English.  Did you --

 9                THE COURT:  There you are.  Right.  So he -- he said

10   he can read English, but he prefers to read Spanish.  So I

11   guess it's not going to refresh his recollection.

12                MS. CRAGER:  Okay, Your Honor.  I understand.

13                THE COURT:  Unless he can read English.

14        Well, let me -- ask him if he talked to the agent in

15   English or Spanish.

16   Q.  BY MS. CRAGER:  When you corresponded with the agent by

17   e-mail, you wrote to them in English; is that correct?

18   A.  That's correct.  English through e-mail.

19   Q.  And they wrote to you in English as well?

20   A.  That's correct, miss.

21   Q.  And you responded to their e-mails?

22   A.  That's correct.

23   Q.  If you could just take a quick look at those notes --

24                THE COURT:  What you're asking about is the e-mail

25   communications he had with the agent?
```

1              MS. CRAGER:  Yes.

2              MR. SHARMA:  Your Honor, this is not -- he can't

3    refresh his recollection on a different document.

4              THE COURT:  Of course he can.  He can look at

5    anything if it might refresh his recollection.  Anything.  The

6    question is does it refresh his recollection.

7         So read those e-mails -- how many pages?

8              MS. CRAGER:  There is just --

9    Q.  BY MS. CRAGER:  If you could just read that one page.  It's

10   just the interview notes.

11             THE COURT:  Wait a minute.  The interview by e-mail

12   or interview --

13             MS. CRAGER:  No.  I was just asking about the e-mails

14   to establish that he can read and write English.  But this is

15   the interview notes from the 2021 interview, Your Honor.  If it

16   doesn't refresh his recollection, that's fine as well.

17             THE COURT:  Read that, and just tell us if it

18   refreshes your recollection as to what you told the agent.  And

19   if it doesn't, we'll stop there.

20             THE WITNESS:  It doesn't refresh my memory, not much.

21   Q.  BY MS. CRAGER:  You can put that aside, then.  Thank you.

22        I want to move on to another way that your version of the

23   story has changed.

24        Today you testified that Rob Pooley got on the phone with

25   you and he said, I am a United States Parachute Association

1  tandem examiner.  Was that your testimony from earlier?

2  A.  That's correct.

3  Q.  And also, testifying earlier, you recounted the entire

4  conversation you had with Mr. Pooley on the phone; is that

5  correct?

6  A.  That's correct.

7  Q.  You said, Hi, Rob.  My name is Fabian Munoz.  Is that what

8  you said?

9  A.  That's correct.

10  Q.  And you explained why you wanted to take a course?

11  A.  I told him that I was going to take the course.  And he

12  responded, No problem.

13  Q.  Okay.  So you remember specifically that he responded, No

14  problem?

15  A.  Yes.  I remember he said to me, No problem.

16  Q.  And you remember specifically he said, Bring money?

17  A.  Of course.

18  Q.  And he said specifically, Bring money in cash?

19  A.  That's correct.

20  Q.  And he said specifically, Yes, I teach the course?

21  A.  That's correct.

22  Q.  And he said, I am the examiner?

23  A.  That's correct.

24  Q.  And he said, I am the US Parachute Association examiner?

25  A.  When he said "examiner," my understanding is that he was

1  from USPA.

2  Q.  I see.  So that part was just your understanding; that's

3  not something he said?

4  A.  That's what he told me, "USPA examiner."

5  Q.  Okay.  So he did say "USPA examiner"?

6  A.  That's correct, miss.

7  Q.  Okay.  That's your specific recollection of that

8  conversation?

9  A.  That's correct.

10  Q.  And you also specifically remember, as you testified, he

11  said, I will sign your paperwork?

12  A.  That's correct.

13  Q.  Okay.  Well, that's not what you said in 2021.  In 2021,

14  you did not say that you had any phone conversation with Rob

15  Pooley.

16  A.  I did have a conversation with Rob Pooley.

17  Q.  I understand that's your testimony today.  My question is

18  you did not say that in 2021?

19  A.  They didn't ask me that.  And I gave them my story

20  regarding my situation here in the United States.

21  Q.  I see.  Well, let me talk to you more about this phone

22  conversation.

23      You are testifying today in Spanish?

24  A.  That's right.

25  Q.  You are not very comfortable with spoken English?

1   A.  The thing is that since so many years have passed by, I've

2   lost practice in utilizing English.  And being in this type of

3   situation, I don't feel comfortable using English.

4   Q.  I understand that.

5       And in another situation, when the agents reached out to

6   you in 2021, you told them, My English is not very good?

7   A.  That's right.

8   Q.  Now, all of the conversations you've testified about today

9   with Rob Pooley occurred in 2016?

10  A.  I didn't quite understand that.  Can you repeat that

11  question?

12  Q.  Let me be more specific.

13      This phone conversation that you testified about occurred,

14  as you say, in 2016?

15  A.  That's correct.

16  Q.  And 2016 was approximately eight years ago?

17  A.  It's been a long time ago.

18  Q.  And so your testimony is that eight years ago, Carlos, your

19  friend, passed the phone to someone?

20  A.  That's right.

21  Q.  You believed that person was Rob Pooley?

22  A.  He told me, Rob Pooley is right next to me.  Speak to him

23  so you can make arrangements to do your course with Rob Pooley.

24  Q.  All right.  You're familiar with the Lodi drop zone?

25  A.  That's right.

1    Q.  The Lodi drop zone is a busy place?

2    A.  What do you mean, a very busy place.

3    Q.  There are lots of skydivers there?

4    A.  That's correct.  It's often a very busy place.

5    Q.  And there are lots of customers there?

6    A.  I suppose so, yes.

7    Q.  When there are customers there, there are safety videos

8    playing on a loop at the center?

9    A.  Um-hum.

10    Q.  Was that a yes?

11    A.  Yes.

12    Q.  When you go outside of the center, there is a highway

13    there.

14    A.  That's right.

15    Q.  A busy highway?

16    A.  That's correct.

17    Q.  And the Lodi drop zone has an airport?

18    A.  That's correct.

19    Q.  And there are planes taking off?

20    A.  That's correct.

21    Q.  And there are planes landing?

22    A.  That's correct.

23    Q.  So in this environment, you're saying you get on the phone

24    with a person you think is Rob Pooley, and he's speaking

25    English?

1    A.  That's correct.

2    Q.  And you've never spoken to him before?

3    A.  No.

4    Q.  Now, after you spoke with the agents in 2021, you had a

5    chance to follow up with them?

6    A.  After 2021, no.

7    Q.  After your interview in 2021, they let you know you should

8    reach out to them if you remember anything else important?

9    A.  Of course.

10   Q.  And, in fact, you did follow up with them a few days later?

11   A.  I was always in contact with the agent.

12   Q.  And when you contacted them a few days later, you said --

13   I'm sorry -- you sent a few things, including the video we

14   watched earlier?

15   A.  That's correct.

16   Q.  But you never followed up with them saying, I just

17   remembered something really important, that I had this phone

18   conversation?

19   A.  They were the ones who asked the questions.

20   Q.  I see.  But they did let you know that you could follow up

21   with them if you thought of anything important?

22   A.  That's right.

23   Q.  And you never followed up to say, Rob Pooley told me, I am

24   a USPA tandem examiner?

25   A.  Rob Pooley told me that he was an examiner for USPA.

1    Q.   I understand that's your testimony today.

2        Now, the truth is Rob told you it was necessary to have a

3    valid examiner sign the paperwork?

4    A.   He didn't tell me that.  I always understood that he said,

5    I am the examiner.

6    Q.   I see.  So you never said that Rob told you it was

7    necessary?

8              THE INTERPRETER:  Counsel, would you please repeat

9    that?

10             MS. CRAGER:  I'm sorry.

11   Q.   BY MS. CRAGER:  So your testimony is Rob never told you it

12   was necessary to have somebody sign off on your paperwork who

13   had an examiner rating?

14   A.   Can you repeat that again?

15   Q.   Let me get to my point here.

16       The truth is Rob told you that another guy who wasn't

17   there, but who was an examiner, would sign off on your

18   paperwork?

19   A.   He never told me that.

20   Q.   Okay.  I understand that's your testimony right now.  I

21   want to talk some more about other things that have been added

22   since you spoke to agents in 2021.

23       You testified to -- that after you finished the course, Rob

24   Pooley told you you had to do a tandem jump with a customer?

25   A.   That's correct.

1    Q.  That's not something you said in 2021?

2    A.  I did say it.

3    Q.  Is it your testimony that in 2021, you told the agents, I

4    only did this tandem jump because Rob Pooley made me do it?

5    A.  Since I arrived at the United States, I did everything that

6    Rob Pooley asked me to do.  For me, my reference -- he was my

7    reference.  He was my examiner.  And I did everything that he

8    requested of me.  Besides, I spoke to him by phone; he assured

9    me; I felt confident, and that's the reason I traveled.

10   Q.  Okay.

11   A.  And when I met -- when I met him in person --

12   Q.  I understand your testimony, and I understand your

13   explanation.

14   A.  I -- I feel that your questions are confusing me somewhat.

15   Q.  Okay.  I'm sorry about that.  Let me try to be clear.

16       I'm asking you, in the year 2021, when you spoke with a

17   federal agent, you did not tell him, I only jump with a

18   customer because Rob Pooley made me do it?

19   A.  I didn't tell him at that time.  But as time went by and my

20   memory was refreshed, I started telling my story with much more

21   details.

22   Q.  I see.  Okay.  So I do want to talk about when you sent the

23   video to the agent.  And as you just clarified, you did not

24   tell him, at that time, Rob Pooley made me do this.

25       What you did tell him at the time was that, This video

1  shows my work as a -- sorry -- as an instructor.

2  A.  When I spoke to the agent, he told me to send him

3  everything that was necessary.  So I sent everything that I had

4  to prove that I had been there.  I sent my Facebook photographs

5  and information verifying that what I was saying was the truth.

6  Q.  Okay.  And when you sent the video that we watched earlier,

7  you did not say, This is a video where Rob Pooley forced me to

8  do a tandem jump with a customer.  You said, This video shows

9  my work as an instructor?

10  A.  Continue, please.

11  Q.  That was my question.  Would you like me to repeat it?

12  A.  Yes, please.

13  Q.  Okay.  Here is my question.  When you sent the video that

14  we watched earlier today, you did not say to the agent, This

15  video shows the tandem jump that Rob Pooley forced me to do.

16  Instead, you said, This video shows my work as an instructor?

17  A.  That video shows what I did in the United States, just as

18  the photographs that I sent, just the same as the story that I

19  related.

20  Q.  I understand.

21       My question is when you sent it to the agent, you said,

22  This video shows my work as an instructor?

23  A.  I didn't say this -- work as an instructor.  I said, This

24  is the material that I have.  Because they asked me, What do

25  you have to prove that you had -- that you were there?  So I

1    sent them everything that was handy.

2    Q.  Okay.

3    A.  I would like to -- to mention that for me, this is

4    something new.

5    Q.  I'm sorry.

6    A.  And when --

7    Q.  The way this works is you need to respond to a question.

8    I'm sorry.  We can clarify.  I'm about to do that.

9    A.  I feel -- I think that your questions are confusing me.

10   Q.  I'm sorry about that.

11       Let me direct you to Exhibit 2139.  It should be in the

12   binder in front of you, if I may approach.

13       This is an e-mail from you?

14   A.  Yes.

15   Q.  This is an e-mail to Reggie Lee?

16   A.  That's right.

17   Q.  Reggie Lee is the federal agent you have been communicating

18   with in this case?

19   A.  That's right.

20           MS. CRAGER:  Your Honor, I move to admit

21   Exhibit 2139.

22           THE COURT:  Any objection?

23           MR. SHARMA:  It's hearsay, Your Honor.  Objection.

24           MS. CRAGER:  It's impeachment, Your Honor.

25           THE COURT:  All right.  So let me look at it.  If

1    it's impeachment, it can be received for that purpose.  So

2    2139?

3              MS. CRAGER:  Yes, Your Honor.  It's in Binder 7.  The

4    impeachment is the third bullet point there.

5              THE COURT:  So it looks like these are just

6    attachments.

7              MS. CRAGER:  So the top e-mail is an explanation

8    written by the witness explaining what the attachments are.

9              THE COURT:  Why don't you take -- Karen, would you

10   show this to her and ask her what she's referring to.  Flag on

11   my copy what you're referring to.

12      (Pause in proceedings.)

13             THE COURT:  All right.  I think the way to handle

14   this, the third bullet point, ask him if he told that to Agent

15   Lee.  I think he probably said he didn't.  So I -- I don't

16   think that's necessary to repeat.  So he can just -- if you

17   show it to him -- he can't read English.  Maybe he can.  Maybe

18   he can't.  I don't know.

19             MS. CRAGER:  He wrote this e-mail, Your Honor.  I can

20   just ask him about the e-mail.  That's fine.

21   Q.  BY MS. CRAGER:  Mr. Munoz, when you wrote this e-mail to

22   Reggie Lee, you said, The video shows my work as an instructor.

23   A.  When I wrote the e-mail, I used the translator so that my

24   writing wouldn't be so informal.

25   Q.  Okay.  Are you saying that the part about Rob forcing you

1    to do it didn't make it through the translator?

2            MR. SHARMA:  Objection, Your Honor.  That's not what

3    he said.

4            THE COURT:  Is the translator a person, or is it a

5    software?  What is it?

6            THE WITNESS:  It's a -- it's a software, and it's --

7    during some occasions, I utilize my son, who speaks English

8    quite well.

9            THE COURT:  Okay.  Let me just pick this up because

10   we'll just be on this forever.

11       Look at this e-mail here, Mr. Munoz.  Do you see where --

12   do you see -- let me point to the part I'm talking about.  This

13   right -- this right here.  All right.

14       Now, that's what you said in English, that's what you said

15   in English, and is that what you intended to say?

16           THE WITNESS:  What I was attempting to say is that

17   that -- this was the video of what I did in the United States.

18           THE COURT:  All right.

19           MS. CRAGER:  All right.

20           THE COURT:  That's what he intended to say.

21           MS. CRAGER:  Thank you, Your Honor.  We'll move on.

22   Q.  BY MS. CRAGER:  Okay.  You testified earlier that when Rob

23   Pooley didn't give you your paperwork after you demanded it,

24   you threatened to complain to the United States Parachute

25   Association.

1  A.  I told him that if he did not give me my documents, I would

2  be speaking to the USPA.

3  Q.  And he didn't give you your documents?

4  A.  At no time -- I felt that at no time did he treat me in a

5  professional manner.  He always avoided me once the course was

6  finished, after I had paid for everything.

7  Q.  I see.  And you never complained to the United States

8  Parachute Association?

9  A.  No.  I never filed a formal complaint to the USPA --

10 Q.  Okay.

11 A.  -- because I felt that he -- like any other place in the

12 world, he would be the individual that after one pays -- as a

13 client, one pays for a service.  I felt that that individual

14 should respond and comply with what I was paying for.  But

15 since I didn't have any kind of receipt, since I have paid in

16 cash, how would I -- how would it be possible for me to

17 complain to the USPA if I didn't have a receipt showing what I

18 paid for.

19 Q.  Okay.  Let's move on, then, to -- I do want to talk about

20 the money.  I want to talk now about why you are testifying to

21 these new and different things today.

22     You want to help the prosecutor?

23 A.  I'm here because I feel that God has led me to do the right

24 things.

25 Q.  You wrote an e-mail to the prosecutor in which you said --

1    I'm sorry -- to the agent -- the prosecutor's agent in which

2    you said, I have every predisposition to help you.

3    A.   Definitely.

4    Q.   And in return, you want the prosecutor and the government

5    to help you.

6    A.   What do you mean with "help"?

7    Q.   You want them to help you get money.

8              MS. LYDON:  Objection --

9              THE WITNESS:  The -- the truth is that if it's

10   required and if the Court feels that I need to be compensated,

11   that it should be whatever the judge decides.

12      There is no doubt that I'm here testifying because I'm also

13   a witness that was affected by this.  I've lost time.  I've

14   lost money.  I've left my family behind.  And I've almost --

15   and I've almost -- I almost lost my job because I was not able

16   to complete the objective that I had.  Luckily, I had the -- I

17   was lucky that there was an examiner from Brazil that happened

18   to be in Chile.

19   Q.   BY MS. CRAGER:  Okay.  Let's --

20   A.   And I had to get some credit.  I had to get credit to pay

21   again.

22   Q.   I'm sorry.  I'm not trying to stop your explanation.  I'm

23   just -- we need to stay on the question.

24   A.   I want to be as honest as possible.

25   Q.   I see.  So if you show that you're a victim of Rob Pooley,

1    you know that you can get paid money?

2            THE COURT:  Not by this case here.  Not by this jury.

3    That's not part of their job.

4            MR. SHARMA:  And I would object on that basis, Your

5    Honor, for the record.

6            THE COURT:  Well, he may misunderstand.  You know,

7    he's not versed in United States law.  But I just wanted to

8    make sure that he understands and the jury understands that

9    it's not part of their job to compensate Mr. Munoz for

10   anything.

11           MS. CRAGER:  Right, Your Honor.  And I can clarify.

12   Q.  BY MS. CRAGER:  You asked the agent about whether you could

13   get paid for testifying?

14           MR. SHARMA:  Objection.  That is not borne by the

15   facts, Your Honor.  That mischaracterizes all the evidence and

16   the testimony.

17           THE COURT:  It's a question.

18      Yes or no, did you ask the agent whether you could get paid

19   for testifying?

20           THE WITNESS:  If I asked the agent if he could pay me

21   for coming here to testify?

22   Q.  BY MS. CRAGER:  Did you ask --

23           THE COURT:  Is that what you're saying?  You asked

24   the agent if he could pay you?

25           THE WITNESS:  I -- I didn't ask him for that.  I said

1    that I could help, that I could come to testify.

2    Q.  BY MS. CRAGER:  Did you also say to Reggie Lee, the agent,

3    Will you help me cover my expenses in Chile while I'm away to

4    testify?  How are we going to solve this?

5    A.  Of course I asked the necessary questions.  I need to find

6    out if the expenses to come up here, I would have to pay from

7    my own pocket.

8    Q.  Of course.

9        So you've talked to the federal agent about -- and the

10   government about whether you can get any money from this whole

11   situation, because you've never been reimbursed?

12            MR. SHARMA:  Objection, Your Honor.  That's

13   mischaracterizing what he said and what he said to Mr. Lee.

14            THE COURT:  It's cross-examination.  Overruled.

15            THE WITNESS:  No.

16   Q.  BY MS. CRAGER:  You never talked to them about whether you

17   could get money from Rob Pooley?

18   A.  No.

19   Q.  You never asked them for their help in suing Rob Pooley for

20   money?

21   A.  What I asked the agent, that if I came to testify here,

22   since I was a witness that had been affected, what would happen

23   regarding of the losses that I suffered here.  The losses

24   regarding of everything that I invested in.  And he said that

25   it would be the judge who would decide that.

1    Q.  I see.  So the judge will decide, in your understanding,

2    about whether you eventually get money?

3    A.  I am here.  Whatever the judge decides, that's what I'll

4    do.

5    Q.  You want to show that Rob Pooley is to blame for you losing

6    money?

7    A.  Do you believe that that's not -- that I didn't?

8    Q.  Are you here testifying trying to show that Rob Pooley was

9    to blame for you losing money?

10   A.  Not just money.  I lost time.  I was unable to do other

11   things in my country.  I lost my family and my job.

12   Q.  And you are hoping to get 5 or $6,000 from Rob Pooley?

13   A.  The truth is I am not expecting to get money out of all

14   this.  What I expect is for justice to be done.

15            MS. CRAGER:  I see.  No further questions.

16            THE COURT:  Any redirect?

17            MR. SHARMA:  Briefly, Your Honor.

18                        REDIRECT EXAMINATION

19   BY MR. SHARMA:

20   Q.  Mr. Munoz, just a few questions.

21       The defense counsel made -- talked a lot about things you

22   didn't mention in 2021 when you spoke with agents.  Do you

23   remember that?

24   A.  Yes.

25   Q.  Now, when the agent called you in 2021, you weren't